# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**BANKRUPTCY ESTATE OF
SANTOSHA HARRIS,**

    **Plaintiff,**

    **v.**                              **Case No. 20-CV-609**

**CITY OF MILWAUKEE,
TERRENCE BRUMIRSKI,
and ABC INSURANCE COMPANY,**

    **Defendants.**

---

## DECISION AND ORDER ON DEFENDANT CITY OF MILWAUKEE'S MOTION FOR SUMMARY JUDGMENT

---

Santoasha Harris, an employee of the City of Milwaukee's Department of Public Works ("DPW"), alleges that her former supervisor, Terrence Brumirski, sexually harassed and assaulted her during her employment. (Docket # 1.) On January 21, 2020, Harris and her husband filed a joint Chapter 7 Bankruptcy Petition but failed to disclose her claims against defendants to the bankruptcy court. (Docket # 58.)

On April 14, 2020, Harris sued the City of Milwaukee (the "City") under Title VII, 42 U.S.C. § 2000(e) *et seq.* and 42 U.S.C. § 1983 alleging sexual harassment and discrimination, hostile work environment, and retaliation. (Compl., Counts One through Five.) Harris also alleges the City is responsible for Brumirski's actions under the doctrine of respondeat superior. (Compl., Count Six.) Harris also brings claims against Brumirski under state law for assault and battery, false imprisonment, invasion of privacy, and intentional infliction of emotional distress. (Compl., Counts Seven through Ten.)

Defendants subsequently moved for summary judgment seeking dismissal of Harris' suit based on her alleged failure to disclose her claims against defendants to the bankruptcy court. (Docket # 44.) On September 27, 2022, Harris moved to reopen her bankruptcy case to amend her schedules to include these asserted claims. (Docket # 55.) Harris' motion was granted by the bankruptcy court and her bankruptcy case was reopened on November 21, 2022. (Docket # 58 at 2.) On January 5, 2023, Harris' bankruptcy schedules were amended to disclose Harris' asserted claims against the defendants. (*Id.*) The Bankruptcy Estate of Santoasha Harris was substituted as the named plaintiff in this case. (Docket # 61.)

The City now moves for summary judgment in its favor as to all of Harris' claims against it. (Docket # 45.) For the reasons further explained below, the City's motion for summary judgment is granted and Harris' Title VII and § 1983 claims are dismissed with prejudice. Harris' remaining state law claims are dismissed without prejudice.

## BACKGROUND FACTS

Harris has worked as an infrastructure repair worker for the City of Milwaukee's Department of Public Works since 2007, working in the barricade shop. (Pl.'s Proposed Additional Findings of Fact ("PPAFOF") ¶ 1, Docket # 65 and Defs.' Resp. to PPAFOF ¶ 1, Docket # 65.) Harris testified that in 2012, Brumirski took over as the plant and equipment repair supervisor in the City's DPW. (Declaration of Katherine A. Headley ("Headley Decl.") ¶ 3, Ex. 3, Deposition of Santoasha Harris ("Harris Dep.") at 21, Docket # 50-3.) Harris testified that after Brumirski took over as supervisor, he acted professionally for the first couple of months. (*Id.* at 23.) However, later in 2012, Harris testified that Brumirski began sexually harassing her. (*Id.* at 29.) She testified that because Brumirski's behavior and words started "progressing" and she started getting very uncomfortable, she

decided to draft an anonymous letter. (*Id.* at 43.) Harris testified that she sent the anonymous letter, dated July 30, 2012, to three individuals—Brumirski's live-in girlfriend, an alderman, and Dan Thomas, who at the time served as the DPW's personnel compliance manager. (Harris Dep. at 34–36; Headley Decl. ¶ 13, Ex. 12; Headley Decl. ¶ 5, Ex. 4, Deposition of Danny Thomas ("Thomas Dep.") at 16–17, Docket # 50-4.) The letter states that Brumirski has been sexually harassing the author and other women at the workplace. (Headley Decl. ¶ 13, Ex. 12, Docket # 50-12.)

Harris testified that during the course of 2012, Brumirski made sexual comments to her on a near daily basis. (*Id.* at 44.) She testified that her co-worker, Edmond Smith, heard Brumirski's comments to her. (*Id.*) Smith provided a sworn statement in which he avers that he witnessed Brumirski frequently make inappropriate comments to Harris, often commenting on her appearance and his desire to be with her sexually. (Declaration of Austin B. Borton ("Borton Decl.") ¶ 1, Ex. 1, Edmond Smith Witness Statement ("Smith Statement") ¶ 4, Docket # 63-3.) Smith avers that he told Brumirski that Harris was a married woman and that he "should not mix business with pleasure." (*Id.* ¶ 6.)

Harris testified that Brumirski's harassment continued from 2012 until 2017. (Harris Dep. 45.) Harris recounted one specific instance in December 2015 where Brumirski grabbed her and tried to kiss her under a mistletoe she had hung in her office. (*Id.* at 60.) However, Harris testified that Brumirski frequently tried to kiss her, force her to sit on his lap, and grab her buttocks and breasts. (*Id.* at 46–51.) On May 25, 2017, Harris testified that Brumirski put his hands down her pants and touched her genitals. (*Id.* at 51.) Harris left work after the incident occurred that day. (*Id.*) On May 26, 2017, Harris told a supervisor, Detria Hardnett, of the May 25 incident and asked her not to tell anyone because she was

3

having an attorney handle the matter. (Def.'s Proposed Findings of Fact ("DPFOF") ¶ 41, Docket # 52 and Pl.'s Resp. to DPFOF ¶ 41, Docket # 64.) Harris contacted the police on May 29, 2017 to report the incident. (*Id.* ¶ 43.)

Harris alleges that three other City employees—Paulette Lee, Carrie Graves, and Veneasha Youngblood—were also sexually harassed by Brumirski. Lee began working for the City in 2010. (Headley Decl. ¶ 17, Ex. 16, Deposition of Paulette Lee ("Lee Dep.") at 7, Docket # 50-16.) Lee testified that sometime in 2017 Brumirski touched her inappropriately at work; however, she did not report the incident to anyone. (*Id.* at 37–40.) Lee further testified that Brumirski would comment on her physical appearance while at work "every now and again." (*Id.* at 40.) Lee stated that she heard multiple people at the City refer to Brumirski as Harris' "stalker." (*Id.* at 43.)

Graves testified that Brumirski made sexually inappropriate comments to her; however, she did not report them. (Borton Decl. ¶ 2, Ex. 2, Deposition of Carrie Graves ("Graves Dep.") at 19–21, Docket # 63-4.) Specifically, Graves testified that Brumirski told her that he was "going to rape [her] in the truck wash before he retired." (*Id.* at 20.) Graves stated that another employee was present when Brumirski made the comment. (*Id.* at 30–31.) Graves testified that she "believed" she told Brian Stankowitz, who worked for the City, about the comment, but not right away. (*Id.* at 32.) Graves testified that Stankowitz told her to keep track of everything Brumirski said and while she did keep a log, she never reported it to human resources or showed the log to anyone. (*Id.* at 33–35.)

Youngblood testified that Brumirski made inappropriate comments and touched her inappropriately "every so often." (Borton Decl. ¶ 3, Ex. 3, Deposition of Veneasha

4

Youngblood ("Youngblood Dep.") at 18–22, Docket # 63-4.) Youngblood testified that she did not tell anyone at the City about Brumirski's actions. (*Id.* at 25.)

On May 30, 2017, Harris, through counsel, sent a letter to the DPW detailing Brumirski's harassment. (Headley Decl. ¶ 15, Ex. 14, Docket # 50-14.) Thomas received the letter on May 31, 2017. (DPFOF ¶ 44 and Pl.'s Resp. ¶ 44.) Thomas immediately separated Harris from Brumirski, to remove her from any potential threat. (*Id.* ¶ 45.) Harris was transferred to the sanitation division for the duration of the investigation. (*Id.* ¶ 46.) During that time, she was assigned to the self-help station, where she did dumpster watch, making sure citizens did not put personal trash in dumpsters near the Milwaukee County Domes, and trash pick-up, where she would pick up trash along the road with a picker. (*Id.*) Thomas spoke with Harris' attorney on June 13, 2017. (*Id.* ¶ 49.) After Thomas spoke with Harris and her attorney, Brumirski was placed on administrative suspension. (*Id.* ¶ 52.) Thomas interviewed several individuals during the investigation, including Steven Trotter, Edmund Smith, Hardnett, and Lee. (*Id.* ¶ 53.) Brumirski resigned, effective July 3, 2017, and Harris returned to the barricade shop. (*Id.* ¶¶ 62–63.)

After returning to the barricade shop, Harris noticed that the shop had been rearranged so that her "makeshift office" was torn down. (DPFOF ¶ 64 and Pl.'s Resp. ¶ 64.) Harris felt this was a direct result of the complaint, but Thomas reported that it is unnecessary for there to be an office in a laboring position. (*Id.* ¶ 65.) Harris applied for two jobs following the investigation into Brumirski's conduct and resignation: (1) Plant & Equipment Repair Supervisor (on August 22, 2017) and (2) Street Operations Supervisor (on October 23, 2017); however, Harris does not dispute that she did not have the requisite experience for either position. (*Id.* ¶¶ 68–70.)

5

## SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. The mere existence of some factual dispute does not defeat a summary judgment motion. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmovant. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment, a party cannot rely on his pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Services, Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

Harris sues the City under both Title VII and § 1983, alleging sexual harassment in the form of quid pro quo and hostile work environment and retaliation for complaining about the alleged sexual harassment. I will address each claim in turn.

*1.    Title VII: Sexual Harassment*

In Counts One and Two of her complaint, Harris alleges sexual harassment in violation of Title VII. Title VII makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e–2(a)(1). Sexual harassment "is a form of sex discrimination in the terms or conditions of employment that consists of efforts by either co-workers or supervisors to make the workplace intolerable or at least severely and discriminatorily uncongenial to members of a certain sex (hostile work environment harassment) and of efforts (normally by supervisors) to extract sexual favors by threats or promises (quid pro quo harassment)." *Schele v. Porter Mem'l Hosp.*, 198 F. Supp. 2d 979, 987–88 (N.D. Ind. 2001) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 751–52 (1998)); *see also Savino v. C.P. Hall Co.*, 988 F. Supp. 1171, 1180 (N.D. Ill. 1997) (stating that Title VII encompasses two types of sexual harassment: hostile work environment and quid pro quo). In her complaint, Harris alleges that she was subjected to both quid pro quo and hostile work environment sexual harassment.

1.1    Quid Pro Quo Sexual Harassment

In Count One of her complaint, Harris alleges that Brumirski subjected her to quid pro quo harassment because submission to Brumirski's unwelcome sexual advances was an express or implied condition for her continued employment. (Compl. ¶ 50.) Quid pro quo

harassment occurs in situations where submission to sexual demands is made a condition of tangible employment benefits. *Bryson v. Chicago State Univ.*, 96 F.3d 912, 915 (7th Cir. 1996). The Seventh Circuit has found that to prove a claim of quid pro quo harassment, courts should focus on whether the plaintiff has shown: (1) that she is a member of a protected group, (2) the sexual advances were unwelcome, (3) the harassment was sexually motivated, (4) the employee's reaction to the supervisor's advances affected a tangible aspect of her employment, and (5) respondeat superior has been established. *Id.*

The City argues that Harris' claim of quid pro quo sexual harassment fails because Brumirski was not Harris' supervisor and because no tangible aspect of her employment was affected. (Def.'s Br. at 5. Docket # 51.) A "tangible employment action" constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits. *Ellerth*, 524 U.S. at 761. Harris argues that the "tangible employment action" taken against her was reassignment from her job in the barricade shop to picking up garbage outside, a job she describes as "humiliating and degrading for someone who has a work history leading a labor crew, and being in charge of the barricade shop." (Pl.'s Br. at 9.) She argues that "being forced to work outside picking up trash, in the cold winters in Wisconsin is a 'significantly harsher workplace environment' then working indoors manufacturing barricades." (*Id.*)

The record evidence does not support that Harris was reassigned to a job with significantly different responsibilities. The crux of Harris' argument is that trash pickup was never a part of her job duties in the barricade shop. (PPAFOF ¶ 34.) Harris points to the testimony of Lee, Graves, and Youngblood who all testified that they were never asked to

pick up trash while working in the barricade shop. (Lee Dep. at 73; Graves Dep. at 82–83; Youngblood Dep. at 42.) Harris also points to Brumirski's testimony that the role of those in the barricade shop was to "manufacture City of Milwaukee barricades that we used for street projects." (Headley Decl. ¶ 6, Ex. 5, Deposition of Terrence Brumirski ("Brumirski Dep.") at 17, Docket # 50-5.) But the fact that none of these employees were ever asked to pick up trash while working in the barricade shop does not establish that it was not a part of their job duties. The City presents the declaration of Thomas Wangerin, the current Street Services Manager in the City's DPW, who avers that from 2016 through November 2022, the job description for Infrastructure Repair Worker included being "involved in placing signs & barricades, in snow cleaning activities and other assigned duties" including "[a]ssignment to other related duties such as: snow removal, patch truck, plant and yard crews, emergency assignments, concrete crews and removal of brush, grass & weeds." (Declaration of Thomas Wangerin ¶ 7, Ex. 2, Docket # 68-2.) Removal of trash fits comfortably within "other assigned duties" such as snow, grass, brush, and weed removal.

Furthermore, even if Harris' assignment to pick up trash constitutes a change to a tangible aspect of her employment, the evidence does not establish that it was Harris' "reaction to the supervisor's advances" that affected this alleged change in job duties. After receiving the letter from Harris' counsel on May 31, 2017, Thomas temporarily moved Harris from the barricade shop to the sanitation division for approximately six weeks while the City investigated Brumirski. (DPFOF ¶¶ 44–46 and Pl.'s Resp. ¶¶ 44–46; Harris Dep. at 73.) It was during this time she testified that her new job included "picking up trash on Lincoln Avenue, dumpster watching and working in the sanitation self-help center." (Harris Dep. at 71–72.) Harris returned to her old job at the barricade shop after Brumirski resigned

9

on July 3, 2017. (DPFOF ¶¶ 62–63 and Pl.'s Resp. ¶¶ 62–63.) Harris does not dispute that Thomas temporarily assigned her to the sanitation division to "remove her from any potential threat" from Brumirski. (*Id.* ¶ 45.)

After Brumirski resigned, Harris' new immediate supervisor at the barricade shop was Detria Hardnett. (Harris Dep. at 166.) Hardnett testified that Harris was asked to pick up trash "a couple" of times with three or four other employees because there was a lot of trash on 35th Street and laborers were needed to clean it up. (Headley Decl. ¶ 12, Ex. 11, Deposition of Detria Hardnett ("Hardnett Dep.") at 80–81, Docket # 50-11.) While Hardnett asked Harris to pick up trash on several occasions, there is no evidence that *Brumirski* ever assigned Harris to pick up trash outside. Thus, even if picking up trash constituted a change in a tangible aspect of her employment, Harris has not shown that it was her reaction to Brumirski's advances that caused the change.

Nor does the evidence show that Brumirski was Harris' "supervisor" for purposes of Title VII. "Supervisor" is a "legal term of art for Title VII purposes, and an employee merely having authority to oversee aspects of another employee's job performance does not qualify as a supervisor in the Title VII context." *Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 506 (7th Cir. 2004), *overruled on other grounds by Ortiz*, 834 F.3d 760. Rather, in *Vance v. Ball State Univ.*, 570 U.S. 421 (2013), the Supreme Court held that an employee is a "supervisor" for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim such as having the power to hire, fire, demote, promote, transfer, or discipline. *Id.* at 424, 431–32. However, "directing work activities and recommending disciplinary action are not in and of

10

themselves sufficient to make someone a supervisor under Title VII." *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 848 (7th Cir. 2008).

Harris presents no evidence that Brumirski had any direct power to take a tangible employment action against her. Both Brumirski and Thomas testified that Brumirski had no authority in his position as supervisor to fire, hire, demote, promote, transfer, reassign, withhold wages, make a significant change in benefits, or discipline any employee (Headley Decl. ¶ 6, Ex. 5, Deposition of Terrence Brumirski ("Brumirski Dep.") at 98–100, Docket # 50-5; Thomas Dep. at 83–90, 171–73) and Harris presents no evidence contradicting this testimony. Rather, Harris argues that Brumirski exercised "apparent authority" over her. (Pl.'s Br. at 6., 8–10). She argues that she and Lee were threatened by Brumirski with reassignment to outdoor laborer work if they did not comply with his requests for physical contact or flirting and by "making the threat, he seemingly possessed the authority and reassignment is a specifically listed adverse employment action." (*Id.* at 8.)

In *Ellerth*, the Supreme Court stated that as "a general rule, apparent authority is relevant where the agent purports to exercise a power which he or she does not have, as distinct from where the agent threatens to misuse actual power." 524 U.S. at 759. The *Ellerth* Court explained:

> In the usual case, a supervisor's harassment involves misuse of actual power, not the false impression of its existence . . . . If, in the unusual case, it is alleged there is a false impression that the actor was a supervisor, when he in fact was not, the victim's mistaken conclusion must be a reasonable one.

*Id.* In this case, even considering the facts in the light most favorable to Harris, as I must, Harris presents no evidence to support a reasonable conclusion that Brumirski presented a false impression of power.

11

Harris first points to her testimony that Brumirski "would always say it's my word against his word" and that she feared losing her job if she reported him. (Harris Dep. at 38.) But Harris did not testify that she believed Brumirski had the authority to fire her; rather, her fear of losing her job stemmed from her belief that Brumirski was friendly with those who did have the authority to fire her. (*Id.* at 39–42.) Harris also points to Lee's testimony that a couple of weeks after the "hugging incident," Brumirski came out of his office and stated to Lee that "It feels good in here. It's better being in here than it is outside, isn't it?" to which Lee responded, "Yeah." (Lee Dep. at 48.) While Lee testified that she felt that his statement was a threat to reassign her out in the cold if she told anyone about the incident (*id.* at 50), there is no evidence that Lee believed Brumirski actually had the authority to do so or that she ever heard of him taking such action (*id.*). Again, there is no evidence that Brumirski ever assigned Lee to pick up garbage outside. Thus, Harris has not shown that her reaction to a supervisor (i.e., Brumirski's) advances affected a tangible aspect of her employment. For these reasons, the City is granted summary judgment in its favor as to Count One of Harris' complaint.

### 1.2    Hostile Work Environment Sexual Harassment

In Count Two of her complaint, Harris alleges that Brumirski subjected her to unwelcome, abusive, offensive, and harassing sexually discriminatory conduct during her employment with the City and the conduct was sufficiently severe and pervasive so as to create a hostile work environment. (Compl. ¶¶ 56–60.)

Title VII's "prohibition on discrimination also reaches the creation of a 'hostile or abusive work environment . . . permeated with discriminatory intimidation, ridicule, and insult.'" *Trahanas v. Nw. Univ.*, 64 F.4th 842, 853 (7th Cir. 2023) (quoting *Alexander v. Casino*

12

*Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014)). To establish a hostile work environment claim, a plaintiff must show: (1) the work environment was both subjectively and objectively offensive; (2) the harassment was based on membership in a protected class; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability. *Id.*

Different standards apply in evaluating an employer's liability for a hostile work environment, depending on whether the alleged harasser is the victim's supervisor or coworker. *Id.* For supervisors, an employer is strictly liable when a "supervisor's harassment culminates in a tangible employment action." *Id.* (quoting *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013)). Absent such action, an employer may raise an affirmative defense to avoid liability. *Id.* But when the harasser is a coworker, "the employer is liable only if it was negligent in controlling working conditions." *Id.*

The City argues that Harris cannot establish the fourth element of her hostile work environment claim—a basis for employer liability. (Def.'s Br. at 6.) The City argues that Brumirski was not Harris' "supervisor" for purposes of Title VII, Harris was not subjected to a tangible employment action, and the City was not negligent in controlling working conditions. (*Id.* at 6–7.) For the reasons explained above, Harris has not shown that Brumirski was her "supervisor" for purposes of Title VII, nor has she demonstrated that Brumirski's harassment culminated in a tangible employment action. Thus, the focus is on the City's affirmative defense that it was not negligent in controlling working conditions.

This defense consists of two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or

13

corrective opportunities provided by the employer or to avoid harm otherwise. *Faragher v. City of Boca Raton*, 524 U.S. 775, 807–08 (1998). The Supreme Court in *Faragher* explained:

> While proof that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense. And while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense.

*Id.* As to the first element, the Seventh Circuit has found that the "'mere creation of a sexual harassment policy will not shield a company from its responsibility to actively prevent sexual harassment in the workplace.'" *Passananti v. Cook Cnty.*, 689 F.3d 655, 673–74 (7th Cir. 2012) (quoting *Gentry v. Export Packaging Co.*, 238 F.3d 842, 847 (7th Cir. 2001)). The court stated that a "policy must provide a meaningful process whereby an employee can express his or her concerns regarding an individual within a working environment . . . it is not enough that an anti-harassment policy appears reasonably effective on paper. The policy also must be reasonably effective in practice." *Id.* at 673–74.

In other words, an anti-harassment policy with no teeth is effectively worthless. An employer cannot simply enact a formal anti-retaliation policy and then rest on its laurels enforcing it. For example, in *E.E.O.C. v. Mgmt. Hosp. of Racine, Inc.*, 666 F.3d 422 (7th Cir. 2012), the Seventh Circuit upheld a jury's verdict that despite the defendants having a sexual harassment policy in place, the policy and complaint mechanism were ineffective in practice. *Id.* at 435. The court considered that the jury heard evidence that all managerial employees failed to carry out their duties under the policy by failing to report harassment after receiving a harassment complaint; some managerial employees themselves engaged in

14

sexual harassment; and the assistant manager received no sexual harassment training despite being responsible for the orientation and training of new employees. *Id.* at 435–36. The court concluded that "a rational jury could have concluded that, not only was the policy and the management training ineffective, but the protections offered by them were illusory." *Id.* at 436.

In this case, the City indisputably has a formal anti-harassment policy in place and Harris received a copy of the policy numerous times throughout her employment. (DPFOF ¶¶ 16–19 and Pl.'s Resp. ¶¶ 16–19.) Harris contends, however, that a question of fact exists as to whether the City's anti-harassment policy was reasonably effective in practice. The crux of Harris' argument is that the City's formal anti-harassment training was insufficient. She points to the testimony of fellow employees Graves, Lee, Youngblood, and Smith, who all state that they received no training on how to properly report complaints of sexual harassment. (Pl.'s Br. at 21.) She also argues that employees in management positions, specifically Hardnett and Brumirski, were insufficiently trained as evidenced by Brumirski's single anti-harassment training session in 1999 and Hardnett's failure to report Harris' complaints of harassment when she confided in her as early as 2012. (Harris Dep. at 106–08.)

Even taking Harris' stated facts as true, no reasonable finder of fact could conclude that the City failed to exercise reasonable care to prevent and correct promptly any sexually harassing behavior. While Harris contends that the City should have mandated formal anti-harassment training, Harris cites no authority that failure to formally train on an anti-harassment policy is dispositive of the employer's reasonableness. Harris relies heavily on her testimony that sometime in 2012, she confided in Hardnett that Brumirski was making

15

inappropriate gestures and comments and that she was getting uncomfortable so Hardnett began coming back to the barricade shop with her so she would not be alone with Brumirski. (Harris Dep. at 106–08.) Harris contends that at the time, Hardnett was a streets repair supervisor and under the City's anti-harassment policy, all supervisors were required to report instances of, and reports of, sexual harassment. (PPAFOF ¶ 25 and Def.'s Resp. ¶ 25.) Harris argues that Hardnett's failure to do so indicates that the City's anti-harassment policy was not reasonably effective in practice.

But Harris' "evidence" that Hardnett was a supervisor consists of the resume Hardnett submitted in 2017 when applying for the plant and equipment supervisor position. (Borton Aff. ¶ 6, Ex. 6, Docket # 63-8.) The resume states that she was a "Streets Repair Supervisor" from June 2003 to the present. (*Id.*) But Hardnett did not testify that she was a supervisor in 2012. Rather, she testified that she became an Infrastructure Repair Worker ("IRW") crew leader in "2012-ish," give or take a year, but that she was still a laborer despite the title and had no additional responsibilities beyond completing paperwork. (Hardnett Dep. at 18–21.) And Harris does not contend that Hardnett was *her* supervisor at the time and specifically testified that she confided in Hardnett regarding Brumirski's alleged harassment in 2012 because Hardnett was her friend and a "loyal person." (Harris Dep. at 106, 111.)

Harris also points to the fact that she told Hardnett about Brumirski's alleged assault the day after it happened, May 26, 2017, and Hardnett did not report it despite undoubtedly holding a supervisor position at the time. (Pl.'s Br. at 20.) Hardnett testified that Harris asked her not to tell anyone because she wanted her attorney to address it. (Hardnett Dep. at 64–65.) When asked whether, as a supervisor, she should have reported the complaint to

16

management, Hardnett testified "Yes, probably, if she wasn't my friend. Yes." (*Id.* at 68–69.) But even if Hardnett violated the City's anti-harassment policy by not reporting Brumirski's alleged assault of Harris, this does not show that the City failed to exercise reasonable care in preventing and correcting sexually harassing behavior. The law "does not require success—it only requires that an employer act reasonably to prevent sexual harassment." *Shaw v. AutoZone, Inc.*, 180 F.3d 806, 812 (7th Cir. 1999). And Hardnett's failure to report the assault, given Harris' instruction not to because she had counsel involved, was not unreasonable. Furthermore, it is undisputed that once Thomas received the letter from Harris' attorney on May 31, 2017, five days later, Thomas separated Brumirski and Harris and began an investigation. (Thomas Dep. at 45–46, 51–53, 107–31.) Thomas ultimately gave Brumirski the option of being discharged or to resign in lieu of discharge. (*Id.* at 132.) Brumirski resigned effective July 3, 2017 (DPFOF ¶ 62 and Pl.'s Resp. ¶ 62), approximately one month after Thomas received the letter from Harris' counsel. On these facts, a reasonable factfinder could not conclude that the City failed to exercise reasonable care to prevent and correct promptly any sexually harassing behavior.

Even if Harris could meet the first element, she has not shown that she reasonably took advantage of any preventive or corrective opportunities provided by the City. In establishing this element, the "relevant inquiry is [ ] whether the employee adequately alerted her employer to the harassment, thereby satisfying her obligation to avoid the harm." *Cerros v. Steel Techs., Inc.*, 398 F.3d 944, 952 (7th Cir. 2005). Harris argues that by sending Thomas an anonymous letter in 2012 stating that Brumirski was sexually harassing her and other women at work, she adequately alerted the City to the alleged harassment. (Pl.'s Br. at 16.) The anonymous letter is dated July 30, 2012. (Headley Decl., Ex. 12.) The

17

letter states, in relevant part, that "our suppose to be supervisor or management [ ] have been sexual harassing myself and other women at our work place." (*Id.*) The only name mentioned in the letter is Terry Brumirski. (*Id.*) Harris testified that she cannot remember when in 2012 that she mailed it, noting that she "held onto it for a while" before sending it out (Harris Dep. at 30), however, she believes it was in the summer (*id.* at 38). Harris testified that she had no idea whether Thomas actually received the 2012 anonymous letter. (*Id.* at 255.) Thomas, for his part, testified that he did not receive the letter in 2012 and that he saw it for the first time after speaking with Harris' attorney in 2017. (Thomas Dep. at 58–59.)

Even assuming that Thomas did receive the letter in 2012, this was insufficient to alert the City to Harris' alleged complaint. The Seventh Circuit's decision in *Hill v. Am. Gen. Fin., Inc.*, 218 F.3d 639 (7th Cir. 2000) is instructive. In *Hill*, Hill alleged that within a month of her September 1994 arrival at her place of employment, her supervisor began sexually harassing her. *Id.* at 641. On February 2, 1995, Hill wrote a letter to the company's chief executive officer complaining of the supervisor's behavior and language but signed the letter using a pseudonym. *Id.* Hill wrote another letter on February 6 complaining of the harassment, this time signing the letter "a very worried and frighten[ed] employee." *Id.* Upon receipt of the letters, the company's human resources department conducted an investigation. *Id.* The employer suspected Hill was the anonymous source; however, she would not confirm that she had written the letters. *Id.* The supervisor was issued a warning. *Id.* Then, on April 14, Hill wrote a letter to the company's director of operations setting out specific instances of harassment, this time signing her own name. *Id.* at 642. Two days later, the company began an investigation and the supervisor was ultimately disciplined. *Id.*

18

In considering whether Hill took advantage of opportunities to prevent harassment, the court concluded that:

> On the basis of the record we must conclude that Hill did not notify the company of the harassment until her letter of April 14. The February letters were not a reasonable effort at notification. They were not signed and she did not acknowledge that she had written those letters when the company investigated the complaints set out in the letters. In fact, Hill began her April 14 letter by apologizing: "Please accept my apology for not being completely honest during the interview with you and the attorneys for the company." She then proceeded to lay out some of her complaints about [the supervisor] and his treatment of her. So, starting with her letter of April 14 Hill took reasonable steps to correct the situation which existed in the Alton office. But the same cannot be said for her actions before April 14.

*Id.* at 643. Harris argues that *Hill* is distinguishable because unlike in *Hill*, Harris never denied writing the July 2012 letter and in *Hill*, the employer actually investigated the anonymous complaint. (Pl.'s Br. at 17–18.) These differences do not address the crux of *Hill*'s finding. The question is whether Harris' anonymous letter reasonably notified the City of Harris' allegations against Brumirski. And like *Hill*, Harris' anonymous letter did not sufficiently notify the City of the alleged sexual harassment. Moreover, there is no indication that during this five-year period between 2012 and 2017 during which the harassment allegedly continued, that Harris followed-up to make sure the City had actually received the letter. *See Jackson v. Cnty. of Racine*, 474 F.3d 493, 502 (7th Cir. 2007) ("One sign of unreasonable behavior on the plaintiffs' part is undue delay in calling the problem to the employer's attention."). Even though the employer in *Hill* conducted an investigation into the anonymous letters, the court still found that the February letters were insufficient notice by Hill to her employer of the harassment. The court has found that "[w]hile a victim of sexual harassment may legitimately feel uncomfortable discussing the harassment with an

employer, that inevitable unpleasantness cannot excuse the employee from using the company's complaint mechanisms." *Shaw*, 180 F.3d at 813.

Harris further argues that it was generally known around the office that Brumirski was her "stalker" and Graves complained to two co-workers, Lopez and Stankiewicz, about Brumirski's harassment. (Pl.'s Br. at 18.) It is true that an employer "may have constructive knowledge of an employee's harassment by virtue of prior complaints lodged by other victims regarding the alleged harasser." *Van Jelgerhuis v. Mercury Fin. Co.*, 940 F. Supp. 1344, 1365 (S.D. Ind. 1996). However, Brumirski's other alleged victims—Lee, Graves, and Youngblood—all testified that they did not report the harassment to management or human resources. (Lee Dep. at 37–40; Graves Dep. at 19–21; Youngblood Dep. at 25.) Rather, Graves testified she told Lopez, an employee who worked in the stockroom (Graves Dep. at 38) and Stankiewicz, an arborist with the City (*id.* at 32). While Harris contends that talk of Brumirski's behavior was swirling around the City, this is a far cry from the City having knowledge of prior complaints lodged against Brumirski.

Again, the evidence shows that when Harris did lodge a complaint against Brumirski in May 2017, the City took immediate action, investigated the complaint, and asked Brumirski to resign or retire, resulting in Brumirski no longer being employed by the City approximately six weeks later. Thus, the undisputed evidence shows that Harris unreasonably failed to take advantage of the City's preventive or corrective mechanisms in reporting Brumirski's alleged harassment until May 2017. For these reasons, Harris' hostile work environment claim fails. The City is granted summary judgment in its favor as to Count Two of Harris' complaint.

20

2. Section 1983 Sex Discrimination

In Counts Three and Four of her complaint, Harris alleges claims of sexual harassment, sex discrimination, and hostile work environment against the City in violation of 42 U.S.C. § 1983. To succeed on a claim under § 1983, Harris must prove that she was deprived of a right secured by the Constitution or the laws of the United States, and that this deprivation occurred at the hands of a person or persons acting under the color of state law. *See D.S. v. E. Porter Cnty. Sch. Corp.*, 799 F.3d 793, 798 (7th Cir. 2015). To succeed on a § 1983 claim against a municipality like the City, Harris must show that she was deprived of a federal right, as a result of an express municipal policy, widespread custom, or deliberate act of a decision-maker for the City, which proximately caused her injury. *See Davis v. Carter*, 452 F.3d 686, 691 (7th Cir. 2006); *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 690–91 (1978). In general, a § 1983 claim alleging equal protection violations due to sexual harassment "follow[ ] the contours of Title VII claims." *King v. Bd. of Regents of Univ. of Wisconsin Sys.*, 898 F.2d 533, 537 (7th Cir. 1990). "One difference between sexual harassment under equal protection and under Title VII, however, is that the defendant must intend to harass under equal protection, but not under Title VII, where the inquiry is solely from the plaintiff's perspective." *Id.* at 537–38 (internal citations omitted). Under § 1983, "actions of a state entity's employees are attributed to the state entity itself if those actions are in furtherance of the entity's 'policy or custom.'" *Bohen v. City of E. Chicago, Ind.*, 799 F.2d 1180, 1188 (7th Cir. 1986). In *Bohen*, the Seventh Circuit found that:

> A single act of a sufficiently high-ranking policy-maker is sufficient to establish an entity's policy or custom. A policy or custom may also be established by proving that the conduct complained of is a "well-settled . . . practice . . . even though such a custom has not received formal approval through the body's decision making channels." [P]ractices of state officials

21

could well be so permanent and well-settled as to constitute a 'custom or usage' with the force of law." An entity may be liable even for "informal actions, if they reflect a general policy, custom, or pattern of official conduct which even tacitly encourages conduct depriving citizens of their constitutionally protected rights."

\*\*\*

[In this case,] [c]omplaints by the victims of sexual harassment were addressed superficially if at all, and the department had no policy against sexual harassment. In sum, sexual harassment was the general, on-going, and accepted practice at the East Chicago Fire Department, and high-ranking, supervisory, and management officials responsible for working conditions at the department knew of, tolerated, and participated in the harassment. This satisfies § 1983's requirement that the actions complained of be the policy or custom of the state entity.

*Id.* at 1189 (internal citations omitted). Harris likens her case to that of *Bohen*. She argues that Brumirski engaged in a pattern of repeated unwelcomed sexual advances both verbally and physically; he subjected women to similar vulgar and inappropriate harassment over a number of years; and the harassment was so well known that numerous employees nicknamed Brumirski Harris' "stalker." (Pl.'s Br. at 27.) She argues that the City ignored her complaints, as evidenced by the City's failure to respond to her 2012 anonymous letter and Lopez, Stankiewicz, and Hardnett not reporting the harassment. (*Id.*)

But Harris' situation differs significantly from that of *Bohen*. Again, Brumirski's actions cannot be attributed to the City unless his actions are in furtherance of the City's "policy or custom" of violating its employees' equal protection rights. The undisputed facts in this case do not show that the City had a "policy or custom" of violating its employees' equal protection rights. While Harris argues that Brumirski subjected multiple women to sexual harassment over a number of years, as stated above, the three individuals Harris points to—Lee, Graves, and Youngblood—all testified that they did not report the harassment to management or human resources. (Lee Dep. at 37–40; Graves Dep. at 19–21;

22

Youngblood Dep. at 25.) And although Harris contends that Graves told two co-workers, Lopez and Stankiewicz, and Harris told Hardnett, the evidence does not support that these individuals were supervisors required to report the alleged harassment under the City's policy. Nor has Harris shown that the City ever received her 2012 anonymous letter or that management was aware of Brumirski's alleged "stalker" moniker. Rather, what the undisputed evidence does show is that when, in May 2017, Harris' supervisor, Thomas received notice of Harris' allegations against Brumirski, he took immediate action, investigating the complaint, interviewing witnesses, and ultimately giving Brumirski the option of resignation or termination. For these reasons, Harris' claims of sex discrimination under § 1983 fail. Summary judgment is granted in favor of the City on Counts Three and Four of Harris' complaint.

### 3. Retaliation

In Count Five of her complaint, Harris alleges that the City retaliated against her for filing an EEOC complaint alleging sex discrimination, in violation of Title VII and § 1983.

As an initial matter, it is unclear whether a claim under the equal protection clause for retaliation following complaints of sex discrimination is viable under § 1983. "Section 1983 does not explicitly address retaliation claims, and it is not apparent from the language of § 1983 alone whether an employment retaliation claim tied to a 'deprivation of any rights, privileges, or immunities' under the Equal Protection Clause of the Fourteenth Amendment is actionable under the statute." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 80 (2d Cir. 2015). While the Second Circuit in *Vega* concluded that a claim of retaliation for a complaint that alleged discrimination is actionable under § 1983, *id.* at 81, it is unclear whether the Seventh Circuit has similarly found as such. Even assuming, however, that such

23

a cause of action exists, it appears that the "elements of a retaliation claim based on an equal protection violation under § 1983 mirror those under Title VII." *Id.* at 91. And although Harris alleges in Count Five retaliation under both Title VII and § 1983, neither party address the § 1983 aspect of the retaliation claim in their briefs. For these reasons, I will address Harris' retaliation claim under Title VII.

Title VII proscribes retaliation against an employee for opposing a practice otherwise made unlawful under Title VII. 42 U.S.C. § 2000e-3(a). Under Title VII, unlawful retaliation occurs when an employer takes actions that "discriminate against" an employee because she has opposed a practice that Title VII forbids. *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 939 (7th Cir. 2007). "'To prevail on a Title VII retaliation claim, the plaintiff must prove that (1) [she] engaged in an activity protected by the statute; (2) [she] suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action.'" *Giese v. City of Kankakee*, No. 22-2022, 2023 WL 4013619, at *4 (7th Cir. June 15, 2023) (quoting *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018)). For a retaliation claim, an adverse employment action is that which would "dissuade[ ] a reasonable worker from making or supporting a charge of discrimination." *Id.* (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).

Harris alerted the City to Brumirski's alleged sexual harassment on May 31, 2017. Harris filed a charge of discrimination with the EEOC on June 22, 2017, alleging sex discrimination. (DPFOF ¶ 1 and Pl.'s Resp. ¶ 1.) Harris alleges that the City took the following actions in retaliation for complaining of Brumirski's alleged sexual harassment: tearing down her office, forcing her to pick up trash and dumpster watch, changing her work schedule causing her to incur additional costs outside of work, altering her ongoing

24

job duties upon her return to the barricade shop, failing to give her performance reviews, failing to provide additional help in the barricade shop, installing a camera above her workspace, and isolating her from other employees upon her return. (Pl.'s Br. at 22, 25.)

For purposes of Title VII, adverse employment actions are "material, sufficiently important alterations of the employment relationship." *West v. Radtke*, 48 F.4th 836, 849 (7th Cir. 2022) (internal quotation and citation omitted). This means "something more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* In *West*, the Seventh Circuit stated that:

> Broadly speaking, three types of employment actions meet the threshold: (1) termination or reduction in compensation, fringe benefits, or other financial terms of employment; (2) transfers or changes in job duties that cause an employee's skills to atrophy and reduce future career prospects; and (3) unbearable changes in job conditions, such as a hostile work environment or conditions amounting to constructive discharge.

*Id.* None of the alleged retaliatory actions Harris describes constitutes an adverse employment action for purposes of Title VII. To begin, Harris takes issue with her approximately six-week reassignment to the sanitation department during the City's investigation of Brumirski. She argues that this assignment forced her to pick up trash outside and dumpster watch and changed her work hours from 6:00 a.m. to 2:30 p.m. to 7:00 a.m. to 3:30 p.m. (Harris Dep. at 72, 76.) Thomas testified that Harris was reassigned to sanitation to separate her from Brumirski once he learned of the alleged harassment. (Thomas Dep. at 51–53.) The decision to transfer her to sanitation was based on where there was an opening that could take her. (*Id.* at 52–53.)

While Harris was unhappy with picking up trash and dumpster watching and the one-hour schedule change, the Seventh Circuit is clear that an adverse employment action

must be "something more disruptive than a mere inconvenience or an alteration of job responsibilities." *West*, 48 F.4th at 849. This is not a situation where Harris was transferred to a materially worse position or was moved from day-shift to night-shift—her laborer position already required such tasks as snow and brush removal and while a one-hour change in schedule may be inconvenient, it is hardly material. Furthermore, this assignment to sanitation only lasted about six weeks.

Harris also contends that after she returned to the barricade shop, she suffered several other alleged adverse employment actions in retaliation for complaining of discrimination. Harris asserts that she had a "makeshift office" in the barricade shop that consisted of three cubicle walls and a fourth wall consisting of a row of lockers and a refrigerator. (Hardnett Dep. at 108; Harris Dep. at 218.) The space did not have a door. (Harris Dep. at 218.) Harris contends that after she returned to the barricade shop, the makeshift office was removed. (*Id.* at 251.) Harris also contends that her new supervisor, Hardnett, required her to pick up trash on several occasions when she was not asked to do that previously in the barricade shop. (Pl.'s Br. at 22.) Finally, she argues that the City failed to give her performance reviews after March 2017, installed a camera above her workspace, and generally isolated her from other employees. (Pl.'s Br. at 22, 25.)

None of these actions, however, constitute "material, sufficiently important alterations of the employment relationship." *See West*, 48 F.4th at 849. As to the "office," Harris does not contend that the lack of this space alters her ability to do her job in the barricade shop. Hardnett testified that generally, only supervisors get cubicles (Hardnett Dep. at 52) and in the barricade shop, the work is not performed at a desk (*id.* at 109–10). As to the request to pick up trash, as explained above, even if Harris was never previously

asked to pick up trash while working in the barricade shop, it does not follow that the request indicates a change in her job duties. Again, Harris' job description includes "[a]ssignment to other related duties such as: snow removal, patch truck, plant and yard crews, emergency assignments, concrete crews and removal of brush, grass & weeds," (Wangerin Decl., Ex. 2) and removal of trash fits comfortably within "other assigned duties" such as snow, grass, brush, and weed removal. And as to the lack of performance reviews after March 2017, even if this constitutes an adverse employment action, it is entirely unclear the causal connection between this fact and Harris' protected activity.

As to the placement of a new camera in Harris' workspace, Wangerin avers that cameras are placed in multiple locations throughout the DPW's Field Headquarters besides in the barricade shop, such as in the paint shop, the carpenter shop, and the ironworker shop. (Wangerin Decl. ¶ 5, Ex. 1.) Harris presents no evidence beyond her own speculation that a camera was placed in the barricade shop to retaliate against her for complaining of sexual harassment.

Finally, while Harris contends that she was generally isolated from other employees and/or did not receive help in the barricade shop, what Harris describes amounts to perceived slights, not material alterations in the employment relationship. For example, Harris states that Hardnett complimented her co-worker, Smith, for a job well done and did not compliment her, despite the fact they both worked on the job and the district manager came to the office to congratulate Smith and did not look at Harris. (Harris Dep. at 173.) She argues that no one says "good morning" to her or holds the door open for her anymore and described one instance where her co-workers left work early to celebrate the Milwaukee

27

Bucks' basketball victory and did not invite her to leave as well. (*Id.* at 175–78.) In *White*, the Supreme Court stated that:

> We speak of *material* adversity because we believe it is important to separate significant from trivial harms. Title VII, we have said, does not set forth "a general civility code for the American workplace." An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience. The antiretaliation provision seeks to prevent employer interference with "unfettered access" to Title VII's remedial mechanisms. It does so by prohibiting employer actions that are likely "to deter victims of discrimination from complaining to the EEOC," the courts, and their employers. And normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence.

548 U.S. at 68 (internal citations omitted). Thus, while these perceived slights are undoubtedly hurtful, they do not amount to an adverse employment action under Title VII. For these reasons, Harris' Title VII retaliation claim fails. Summary judgment is granted in favor of the City on Count Five of Harris' complaint.

> 4. *Remaining State Law Claims*

Harris brings a claim of respondeat superior against the City in Count Six of her complaint. Harris acknowledges that the City cannot be liable under respondeat superior under *Monell* and § 1983 and she is correct that a claim of respondeat superior is not a separate Title VII claim. (Pl.'s Br. at 29.) Harris argues the claim under Wisconsin statute. (*Id.*) Thus, Count Six is a state law claim. Counts Seven through Ten of her complaint are state law claims against Brumirski.

Thus, with the dismissal of the Title VII and § 1983 claims against the City, all that remains are Harris' state law claims. I will follow the general rule by relinquishing jurisdiction over the supplemental state law claims. *See Redwood v. Dobson*, 476 F.3d 462, 467 (7th Cir. 2007) ("A court that resolves all federal claims before trial normally should

28

dismiss supplemental claims without prejudice."). Thus, Harris' state law claims are dismissed without prejudice.

**CONCLUSION**

Harris alleges that Brumirski sexually harassed her for several years and that the City and Brumirski are liable for the sexual harassment under both federal and state law. On this record, the undisputed facts show that no rational trier of fact could find for Harris as to her Title VII and § 1983 claims against the City. For this reason, summary judgment is granted in favor of the City as to these claims. I decline to exercise supplemental jurisdiction over Harris' remaining state law claims and dismiss these claims without prejudice.

**ORDER**

**NOW, THEREFORE, IT IS ORDERED** that defendant City of Milwaukee's motion for summary judgment (Docket # 45) is **GRANTED**. Counts One through Five of Harris' complaint are dismissed with prejudice.

**IT IS FURTHER ORDERED** that Counts Six through Ten of Harris' complaint are dismissed without prejudice.

**FINALLY, IT IS ORDERED** that this case is dismissed. The clerk of court will enter judgment accordingly.

29

Dated at Milwaukee, Wisconsin this 7th day of September, 2023.

BY THE COURT:

_____
NANCY JOSEPH
United States Magistrate Judge